MARY J. ZALAZAR, Plaintiff-Appellant, v. MICHAEL P. VERCIMAK, Defendant-Appellee.

Third District No. 3—93—0134

Opinion filed November 30, 1993.—Modified on denial of rehearing May 19, 1994.

Herbolsheimer, Lannon, Henson, Duncan & Reagan, of La Salle (R.J. Lannon, Jr., of counsel), for appellant.

Kostantacos, Traum, Reuterfors & McWilliams, of Rockford (Erik K. Jacobs, of counsel), for appellee.

JUSTICE BARRY delivered the opinion of the court:

Plaintiff Mary J. Zalazar brought this action against defendant Michael P. Vercimak, M.D., complaining of injuries suffered as a result of defendant's failure to warn her of risks and possible complications of a cosmetic surgery she underwent, known as a four-lid blepharoplasty. Upon completion of plaintiff's case in chief, defen-

dant moved for, and the circuit court of La Salle County granted, a directed verdict for defendant. Plaintiff appeals from the order directing a verdict and from the denial of her post-judgment motion for a new trial.

The record on appeal discloses that plaintiff consulted defendant in 1988 about improving her facial appearance by reducing the bags under her eyes. At the time, plaintiff was 55 years old. She is of Mexican descent and is illiterate, having had no schooling either in Mexico or in the United States. Plaintiff speaks both English and Spanish and has done factory work most of her life. Plaintiff's friend had had bags under her eyes removed surgically, and plaintiff found them beautiful, just like when she was young. Plaintiff sought the same result.

Plaintiff's chiropractor recommended Dr. Vercimak, a general and plastic surgeon practicing in Mendota, Illinois. According to plaintiff, defendant looked at her and told her that he could help to make her look 20 years younger. Plaintiff asked about the cost of the procedure, and defendant told her he would accept $318, the amount of plaintiff's weekly take-home pay from her job. The following week, July 21, 1988, plaintiff appeared at the Mendota Hospital for a four-lid blepharoplasty. Plaintiff testified that she was given a form to sign prior to surgery, but she was unable to read it, and it was not read to her prior to her signing of it. She believed that the procedure was a simple one. She was never told that there were any risks or complications. However, after she awoke from the anesthetics, plaintiff could not see clearly. She suffered from bruising, numbness and lumps on her face. She said that her eyes were droopy and one looked smaller than the other. She resorted to wearing sunglasses all the time. Plaintiff was very distressed about the result. Defendant told her her eyes would improve with time.

After four months, plaintiff returned to defendant. Her eyes were still droopy, the lower lids pulling away from her eyeballs, but most of the lumps had disappeared. Again, defendant advised plaintiff to give it more time. After more than a year had elapsed plaintiff returned still complaining about the droopiness, and defendant said he could do some touch-up surgery. Plaintiff, however, refused to allow defendant to do any more. She said she wanted to be referred to an expert. Defendant recommended Dr. Corley in Peoria, and Dr. Corley referred plaintiff to the University Hospitals in Iowa City, Iowa.

Plaintiff testified that she made an appointment for repair surgery with Dr. Carter in Iowa City. Dr. Carter's associate explained to plaintiff the risks and possible complications involved in the

touch-up surgery. She agreed to have the procedure done because she believed that she looked so bad. Plaintiff was satisfied with the results of Dr. Carter's surgery. However, she testified that at the time of trial she still suffered from some droopiness, some numbness in her face, excessive tearing and sore eyes. She testified that had she known of the risks and possible complications in the first instance she would not have gone ahead with the surgery performed by defendant.

Defendant testified as an adverse witness in plaintiff's case. He stated that he had performed 20-some blepharoplasties prior to plaintiff's. He said that a major complication of the procedure might be loss of vision. Another common complication is ectropion, which is a pulling away of the lower lid from the eyeball. The procedure can also interfere with the patient's tearing and cause sensitivity to bright lights or wind or result in a condition known as epiphora, in which the tears fall outside the eyelid. Defendant opined that, at the least, a patient should be informed about the possible complications of loss of vision and ectropion before submitting to surgery. Defendant did not, however, specifically state that he in fact informed plaintiff of the risks or complications prior to performing the four-lid blepharoplasty on her. Defendant testified only that he *"indicated* there was a possibility of complications and [he] *touched* on the complications \*\*\*, a possibility of loss of vision and a possibility that she may have ectropion." (Emphasis added.)

Defendant was allowed to call Nurse Sue McConville to testify out of order. She testified that she had signed the hospital's pre-operative surgical consent form. As a practice, McConville said, she would have the patient read the form or she would read it to him/her and determine whether the patient had any questions before signing it. The preprinted form certifies that "advantages and possible complications, if any," were explained to the patient by Dr. Vercimak. McConville had no specific recollection, however, of plaintiff and could not state affirmatively that she had read the form to her.

At the close of plaintiff's case in chief, defendant moved for a directed verdict on the ground that plaintiff had failed to meet her burden of proof of proximate causation, *i.e.*, she failed to present objective evidence that a reasonably prudent person in plaintiff's position, aware of the risks and possible complications, would have refused the surgery. In granting defendant's motion, the court commented as follows:

> "In this record, what I have is the subjective standard. I have [plaintiff] saying that she'd not have done it. I need something more than just that. Under my understanding of the law, even

though my personal opinion is I think the subjective standard would be the more appropriate standard, that's not the law of Illinois.

And that being the case, then, I am compelled to grant a directed verdict."

As aforesaid, plaintiff's post-judgment motion was denied, and this appeal followed.

The dispositive issue before us is whether an objective standard for proving proximate cause is an inappropriate standard for a failure-to-warn medical malpractice suit involving esthetic cosmetic surgery. It appears that the issue thus framed is one of first impression in this State.

■ The general standard of proving proximate causation in medical malpractice suits involving "informed consent," as plaintiff acknowledges, requires objective evidence that the patient would have refused the proposed procedure had he/she been informed of the risks/complications involved. (*Lowney v. Arciom* (1992), 232 Ill. App. 3d 715, 597 N.E.2d 817.) The standard is satisfied upon expert evidence that a reasonable medical practitioner, in similar circumstances, would have told the patient of such risks/complications, and that the failure to do so was the proximate cause of the patient's injury. (*Green v. Hussey* (1970), 127 Ill. App. 2d 174, 262 N.E.2d 156.) As noted by this court in *Lowney*, the rationale for applying an objective standard was explained in *Cobbs v. Grant* (1972), 8 Cal. 3d 229, 245, 502 P.2d 1, 11-12, 104 Cal. Rptr. 505, 515-16:

" 'The patient-plaintiff may testify on this subject but the issue extends beyond his credibility. Since at the time of trial the uncommunicated hazard has materialized, it would be surprising if the patient-plaintiff did not claim that had he been informed of the dangers he would have declined treatment. Subjectively he may believe so, with the 20/20 vision of hindsight, but we doubt that justice will be served by placing the physician in jeopardy of the patient's bitterness and disillusionment. Thus an objective test is preferable: i.e., what would a prudent person in the patient's position have decided if adequately informed of all significant perils.' " (*Lowney*, 232 Ill. App. 3d at 717, 597 N.E.2d at 819.)

However, we note that the cases cited to us involve medical procedures for the treatment of physiological or health-related conditions. (*E.g.*, *Lowney*, 232 Ill. App. 3d 715, 597 N.E.2d 817 (chiropractic treatment for neck pain); *Green*, 127 Ill. App. 2d 174, 262 N.E.2d 156 (cobalt and X-ray treatment following breast cancer surgery); *Marshall v. University of Chicago Hospitals & Clinics* (1987), 165 Ill. App. 3d 754, 520 N.E.2d 740 (tubal ligation for birth control purposes on a borderline diabetic).) The parties have not directed our

attention to any precedent applying the objective standard in analogous cases involving esthetic cosmetic surgery, and our research has failed to disclose any such precedent.

■ Plaintiff does not seriously dispute the efficacy of the objective standard for proving proximate causation in cases involving medical procedures for physiological or health-related purposes, but she urges that the rationale for an objective standard does not hold up in the instance of esthetic cosmetic surgery. We agree.

The duty of the physician is not only to disclose the risks of surgery, but also the foreseeable results and the reasonable alternatives to such a procedure. (*Magna v. Elie* (1982), 108 Ill. App. 3d 1028, 1031, 439 N.E.2d 1319.) In this regard, cases involving esthetic cosmetic surgery differ qualitatively from procedures to address patients' medical well being. Unlike chiropractic, cobalt and X-ray treatments, and even tubal ligation, the procedure in this case involves no medically significant benefits to the patient and the alternative is simply to forego the procedure. What kind of expert can objectively weigh the benefits and risks of such a procedure in determining what a so-called "reasonable person" would have decided? We do not believe that such an expert can be found. Where no expert can objectively evaluate whether the failure to warn was the proximate cause of the patient's injury, no expert can be required.

The underlying reason why courts have adopted the objective standard and required the testimony of an expert witness is not applicable in cases such as these. The objective standard and expert witness requirement within informed consent cases arose from the recognition that many medical procedures are "not matters of common knowledge or within the experience of laymen." (*Green*, 127 Ill. App. 2d at 184.) Yet, unlike most surgical procedures, the alternative to esthetic cosmetic surgery is readily apparent to the laymen on the jury.

It is fairly debatable whether any reasonably prudent person would subject him/herself to the type of elective plastic surgery performed here for purely esthetic purposes if properly informed of the risks and complications, such as loss of sight for the procedure in this case. In any event, such a decision is too personal to turn on third-party testimony. Lacking a clear insight into the psychological make-up of the plaintiff and her personality, third-party or expert testimony as to the decision a reasonably prudent person would make under similar circumstances would be of dubious value to the trier of fact, at best. Indeed, where a surgical procedure involves no medical benefit to the patient and the decision is too subjective, the admissibility of the expert's opinion is questionable. See *Scholle v. Continental*

*National American Group* (1976), 44 Ill. App. 3d 716, 721, 358 N.E.2d 893, "an expert witness may not base his opinion upon guess, conjecture, or speculation."

The surgery which plaintiff chose to have performed in this case was purely for esthetic purposes. Plaintiff desired a younger appearance by eliminating signs of aging around her eyes. There was no medical necessity for a four-lid blepharoplasty, and no medical purpose was served by having the procedure performed. The choice plaintiff made was a subjective, personal one that only she could make. We believe no expert or other third party could possibly assert how a reasonable person in plaintiff's position would have weighed the risks and complications of the surgery, and whether such individual would have decided against or gone ahead with the four-lid blepharoplasty had the proper disclosures been made by Dr. Vercimak.

Here, it bears repeating that while testifying as an adverse witness, defendant acknowledged that risks of surgery—in particular, ectropion and loss of vision—should have been disclosed. Yet, the defendant did not specifically testify that he had in fact disclosed and discussed the risks to this plaintiff. We believe that where a jury is informed of the disclosures that should have been given, as well as the disclosures that actually were given, the jurors are in a position to determine proximate causation without further expert testimony. We see no reason to mechanically apply the objective standard and expert witness requirement to this category of cases.

In our opinion, the testimony plaintiff gave respecting the touch-up procedure was probative of the subjective aspect of the proximate causation issue in this case. Plaintiff acknowledged that she in fact had been informed of the risks and complications she faced prior to the second procedure. However, at the time of trial she could not recall what she had been then told. Notwithstanding the information she had been provided, and despite the fact that some of the same complications and risks thus disclosed had in fact materialized as a result of the first surgery, plaintiff elected to proceed with the touch-up surgery to repair her eyes and improve her appearance. This testimony factored into the subjective prong of proximate causation and could be weighed by the trier of fact against plaintiff's purely subjective statement that she would not have submitted to surgery in the first instance had she been informed of the risks and complications of a four-lid blepharoplasty.

We believe that a jury, given all the facts and an opportunity to assess the witnesses' credibility, could fairly apply comparative negligence and determine whether in fact the lack of plaintiff's informed consent to surgery was a proximate cause of her injury. We

recognize that our holding today places a heavy burden on a defendant-physician to probe the subjective decision-making process of cosmetic surgery plaintiff-patients complaining of lack of informed consent, but we deem the subjective standard preferable to the insurmountable burden that the objective standard poses for the plaintiff-patient in such cases. Also, we note that documentation of the informed consent procedure via video tape or other means would not appear to be unreasonably burdensome, considering the regularity with which photography is utilized in connection with surgical procedures.

■ We hold, therefore, that objective or expert evidence as to what plaintiff's decision would have been had she been reasonably informed of risks and complications of elective four-lid blepharoplasty was not required in this case. The objective decision-making process of the jury can determine whether proximate causation has been established based on the testimony admitted herein. In all other respects, we find that the evidence presented at trial established a *prima facie* case for medical malpractice under a failure-to-inform theory.

Accordingly, we reverse the judgment of the circuit court of La-Salle County granting defendant's motion for a directed verdict and remand this cause for a new trial consistent with the views expressed herein.

Reversed and remanded.

SLATER, P.J., and LYTTON, J., concur.