**Loretta MURREY, as Administratrix of the Estate of Thomas D. Murrey, Plaintiff–Appellant,**

v.

**UNITED STATES of America, Defendant–Appellee.**

No. 95–1523.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 29, 1995.

Decided Jan. 18, 1996.

William J. Sneckenberg (argued), Sneckenberg & Associates Chicago, IL, for Plaintiff–Appellant.

Linda A. Wawzenski (argued), Office of The United States Attorney, Chicago, IL, Thomas P. Walsh, Office of the United States Attorney, Civil Division, Chicago, IL, for the U.S.

Before POSNER, Chief Judge, and KANNE and DIANE P. WOOD, Circuit Judges.

POSNER, Chief Judge.

Thomas Murrey died of massive internal bleeding the day after his prostate gland was removed in an operation in a Veterans Administration hospital in North Chicago. His estate brought suit under the Federal Tort Claims Act. After a bench trial, the district judge rendered judgment for the United States. The appeal presents a number of issues, which a simple narrative of the events culminating in Murrey's death can best organize.

Murrey first visited the hospital in 1986. He was 65, and had just retired. He came to the hospital with multiple ailments—high blood pressure, obesity, chronic bronchitis, emphysema, psoriasis, and hypoglycemia—for which various medications, and changes in diet, were prescribed. He returned in 1989, now aged 68, with urological complaints, and was diagnosed as having prostate cancer. It was, we infer from the medical records, a fairly aggressive, fairly advanced case of prostate cancer, but it was not believed to have spread yet outside the prostate. The urologists at the hospital advised Murrey to have a radical prostatectomy—that is, surgical removal of the entire prostate. The widow testified that because of her husband's fear of surgery, both of them asked the urologists about the alternative of radiation treatment and were told that surgery was the better alternative because of Mr. Murrey's "great" physical condition and because the hospital did not offer radiation treatment. The government admits that the urologists advised the Murreys that he should have the operation. There is evidence, forming the basis of the plaintiff's claim that the hospital failed to obtain Murrey's informed consent to the operation, that given his age and the stage of his cancer the choice between surgery and radiation was pretty much a toss-up in terms of the efficacy of the respective treatments—quite apart from the greater risk of death from the operation than from radiation (Craig Fleming et al., "A Decision Analysis of Alternative Treatment Strategies for Clinically Localized Prostate Cancer," 269 JAMA (*Journal of the American Medical Association*) 2650, 2652 (1993)) and the greater likelihood of unpleasant side effects, such as impotence and incontinence.

The district judge did not make any findings on whether the hospital had obtained Mr. Murrey's informed consent. The judge held, without discussion, that failure to obtain informed consent is a species of misrepresentation and is therefore excluded from the Tort Claims Act's waiver of sovereign immunity by 28 U.S.C. § 2680(h). The government does not defend the ground of the judge's ruling, but does argue that the claim is barred by not having been included in the administrative claim that the Act requires be filed within two years of the accident. 28 U.S.C. §§ 2401(b), 2675(a). Neither ground is tenable. The exclusion of claims of misrepresentation is designed to protect the government from being sued for fraud and other torts that come under the general legal heading of misrepresentation, whether intentional or negligent, *United States v. Neustadt,* 366 U.S. 696, 702, 81 S.Ct. 1294, 1298, 6 L.Ed.2d 614 (1961); *Office of Personnel Management v. Richmond,* 496 U.S. 414, 430, 110 S.Ct. 2465, 2474, 110 L.Ed.2d 387 (1990), injuring merely the pock-

etbook. It does not exclude claims of physical injury that happen to involve, as many do, an element of communication or misleading silence. *United States v. Neustadt, supra*, 366 U.S. at 711 n. 26, 81 S.Ct. at 1302 n. 26; *Krejci v. U.S. Army Material Development Readiness Command*, 733 F.2d 1278 (7th Cir.1984). Battery, for example, is battery, not fraud, even when it takes the form of sexual penetration permission for which was obtained by the "batterer's" concealing the fact that he has a sexually transmittable disease. *Crowell v. Crowell*, 180 N.C. 516, 105 S.E. 206 (N.C.1920); *Desnick v. American Broadcasting Cos.*, 44 F.3d 1345, 1352 (7th Cir.1995). The negligent infliction of personal injury, which is *the* classic tort that the Tort Claims Act allows the United States to be sued for, does not cease to be such when the negligence consists of a failure to warn. That is a feature of many garden-variety personal injury suits. If a train fails to blow its whistle at a crossing and a pedestrian crossing the tracks is lulled by the silence into thinking he is safe, and is killed, we call the railroad's tort negligence, not misrepresentation. Failing to advise the defendant of the risks of a medical procedure (which later materialize), or of the advantages of an alternative procedure that would involve fewer risks, is likewise a failure to warn that if it results in personal injury is classified as a tort of negligence, not a tort of misrepresentation. *Keir v. United States*, 853 F.2d 398, 411 (6th Cir.1988); *Ramirez v. United States*, 567 F.2d 854, 857 (9th Cir. 1977) (en banc); *Hicks v. United States*, 511 F.2d 407, 414 (D.C.Cir.1975).

But to base a suit on lack of informed consent Murrey's estate was required to include, or at least to allude to, the issue of informed consent in the administrative claim. The statute requires a plaintiff to file his or her "claim" with the relevant agency, 28 U.S.C. § 2675(a), but it does not define "claim." The word could mean the same thing it means in the Federal Rules of Civil Procedure—what used to be called a "cause of action," or in layman's terms a legal basis for suit. The plaintiff has two such bases. The main one, to which we shall come in a moment, is negligence in the treatment of Mr. Murrey when, on the morning following

the operation, he began to hemorrhage internally. The subordinate one is the failure to obtain his informed consent to the operation. These are distinct grounds of liability arising from distinct facts. They are therefore separate claims within the meaning of the civil rules.

■ The cases interpreting section 2675(a) say that the administrative claim is to be interpreted more liberally than a complaint. *Johnson by Johnson v. United States*, 788 F.2d 845, 848–49 (2d Cir.1986); *Broudy v. United States*, 722 F.2d 566, 568–69 (9th Cir.1983); *Bush v. United States*, 703 F.2d 491, 494 (11th Cir.1983). There is a tiny textual hook to hang this distinction on: "claim" as used throughout the civil rules is short for "claim for relief," Fed.R.Civ.P. 8(a), whereas "claim" in the Tort Claims Act may carry its ordinary-language meaning of demand. (The tort claimant is required to demand money damages in a "sum certain." 28 C.F.R. § 14.2(a); *Manko v. United States*, 830 F.2d 831, 840 (8th Cir.1987).) A "claim" under the civil rules is embedded in a complaint, which also contains a demand for relief. The free-standing "claim" to which the Tort Claims Act refers is the counterpart of the complaint, rather than of the claim, under the civil rules.

■ A more important consideration is that complaints can be amended at any time with leave of court, which "shall be freely given when justice so requires." Fed. R.Civ.P. 15(a). Even if the amendment adds a claim after the statute of limitations has run, the new claim will not be barred if it arises out of the same transaction or occurrence as the original claim. Fed.R.Civ.P. 15(c)(1). As a result, the penalty for failing to state the right claim or all your claims in the original claim is usually small and often nonexistent. But if your administrative tort claim is found to have been inadequate, the court is divested of jurisdiction over your suit. There is no "relation back" provision corresponding to Rule 15(c)(1) of the civil rules. *Lee v. United States*, 980 F.2d 1337, 1339 (10th Cir.1992). The purpose of the requirement of filing an administrative claim is to make sure that the plaintiff exhausts his

administrative remedies before bringing suit. The purpose would be thwarted if he could add new claims after suit has begun. But the fact that failing to file a timely administrative claim has such a fell consequence argues for greater liberality in determining whether the administrative claim is adequate.

It is imprecise, however, to say that section 2675(a) requires less formality than Rule 8(a). When cases like *Johnson by Johnson v. United States* contrast the requirements of the Tort Claims Act with "formal pleading requirements," 788 F.2d at 848, they forget how relaxed and informal are the pleading requirements under the civil rules' "notice pleading" regime, *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Jackson v. Marion County*, 66 F.3d 151 (7th Cir. 1995), and how ultraliberally those relaxed and informal requirements are interpreted when the plaintiff is unrepresented. *Haines v. Kerner*, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (per curiam). It is unclear just how much space there is between a minimal complaint adequate under the civil rules and a minimal claim adequate under the Tort Claims Act though not under the civil rules.

There is a deeper objection to viewing section 2675(a) as a step beyond Rule 8(a) along the path of ever-diminishing formality. By leaving "claim" undefined, Congress invited the Department of Justice to define the word through regulations. The Department has done that, more or less, in 28 C.F.R. § 14.2(a), which provides that "a claim shall be deemed to have been presented when a Federal agency receives from a claimant, his duly authorized agent or legal representative, an executed Standard Form 95 or other written notification of an incident, accompanied by a claim for money damages in a sum certain for injury to or loss of property, personal injury, or death alleged to have occurred by reason of the incident." The reference to "Standard Form 95" indicates that a claim, to pass muster, must contain the information required by the form. By examining the form, we can determine how much detail is required and whether Murrey's submission satisfied the requirement.

The document that the plaintiff's lawyer submitted to the Department of Veterans Affairs is captioned "Claims," not "Claim." The document has four sections, of which the first is captioned "The Claim" and the second "Thomas D. Murrey Biography" (the third and fourth concern the amount of damages sought). "The Claim" is the two-page Standard Form 95, which asks for, among other things, the "Basis of Claim." The form explains what this means by telling the claimant to "state in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof." The form adds, "Use additional pages if necessary"—for the space allotted to the detailed statement of "known facts and circumstances" is only two inches long. Although the only events that the plaintiff narrated in the space provided are the surgery and its sequel and the only "claim" mentioned concerns the treatment of Murrey's postoperative bleeding, the "biography" that follows the standard form includes the following statement: "On November 15, 1989, Tom [Murrey] entered the Veterans Hospital in North Chicago to undergo a radical prostatectomy. He was extremely fearful of this surgery. However, V.A. physicians assured him and his family that surgery was the only available therapy, and that it would extend his life by 15 years." This is a statement of the essential facts underlying a claim of failure to obtain informed consent.

Standard Form 95 resembles a civil complaint in not requiring a statement of legal theories, but differs in requiring a detailed statement of facts. It is in this respect more demanding, more "formal" if you will, than the civil rules—a throwback, perhaps, to the era of "fact pleading" that preceded the adoption of those rules. But as no statement of legal theories is required, only facts plus a demand for money, the claim encompasses any cause of action fairly implicit in the facts.

The reader of the "Claims" document submitted by Murrey's estate was not invited to stop with the standard form; nor does 28 C.F.R. § 14.2(a) require that the narrative of facts be confined to the form. The form itself, as we saw, invites supplementation

with additional pages. Clearly, the entire "Claims" document was intended to be read, and if it was read the informed-consent claim would leap out at the legally sophisticated reader. The government thus had all the notice that the law required—a conclusion strongly supported by *Rooney v. United States*, 634 F.2d 1238, 1242–43 (9th Cir.1980), a factually similar case.

We do not go so far as the Fifth Circuit, which in *Frantz v. United States*, 29 F.3d 222 (5th Cir.1994), held that a claim of failure to obtain informed consent is implicit when the administrative claim alleges medical negligence and investigation would turn up the facts showing that failure. We agree rather with the Eleventh Circuit in *Bush v. United States, supra*, 703 F.2d at 495, that the administrative claim must narrate facts from which a legally trained reader would infer a failure to obtain informed consent. But it did. The judge's refusal to make findings on whether the hospital obtained Murrey's informed consent to the operation was therefore error. We offer no opinion on the merits of the claim. To conceal from a patient the alternatives to major surgery is a serious form of medical negligence, *Zalazar v. Vercimak*, 261 Ill.App.3d 250, 199 Ill.Dec. 232, 235, 633 N.E.2d 1223, 1226 (Ill.App.1993); *Magana v. Elie*, 108 Ill.App.3d 1028, 64 Ill.Dec. 511, 513, 439 N.E.2d 1319, 1321 (Ill.App. 1982); *Canterbury v. Spence*, 464 F.2d 772 (D.C.Cir.1972), but the evidence is in conflict over what the Murreys were told.

■ The operation took seven hours, and afterward Murrey was placed in the Intensive Care Unit. He seemed fine. The plaintiff believes that the hemorrhaging which occurred the next day and killed Murrey may have been due to some negligent mishap in the operation itself. But the evidence was very thin, and the judge did not commit a clear error in rejecting this theory of liability. The cause of the hemorrhaging has never been determined, in part because no autopsy was performed on Murrey. The plaintiff argues that the hospital misled the family about the cause of Murrey's death, leading them to believe that an autopsy was unnecessary, and as a result the hospital committed a distinct tort of failing to preserve evidence for the suit. However, this tort, if it is a tort, is barred by the exemption for torts of misrepresentation.

■ At 8:35 on the morning after the operation, Murrey was given morphine because he was complaining about abdominal discomfort. Within five minutes his blood pressure was observed by the nurses to have dropped significantly, and a critical-care resident assigned to the Intensive Care Unit, Dr. Jankowski, was immediately summoned. Murrey's blood pressure had dropped so low—to 64/51—that Jankowski strongly suspected that Murrey was in shock. Shock in the medical sense can be induced by various things, including infection, a heart attack, a pulmonary embolism—and bleeding. Although Jankowski suspected that Murrey's shock was caused by internal bleeding, she administered tests designed to exclude the other possibilities and was not sure that the cause was bleeding until the tests were completed at 9:57 a.m. The plaintiff argues that Jankowski should not have waited for the completion of the tests before concluding that Murrey was hemorrhaging and should therefore be dispatched immediately to an operating room for surgery. But we think the district judge did not commit clear error in finding that the delay of an hour or so in making a definitive diagnosis was within the outer bounds of a responsible professional judgment. The decision to start cutting into someone looking for a source of internal bleeding (for Jankowski had already ascertained that the wound from the surgery was not bleeding) is not a step to be taken lightly.

What is true is that by 9:57, as it now appears in hindsight, Murrey's prospects for survival were dim. His own expert testified that even if Murrey had been operated on immediately to stop the internal hemorrhaging, he would have had only a 5 to 10 percent chance of surviving. It does not matter, as far as liability is concerned, how good or bad his prospects were (obviously it matters greatly to the amount of damages). The government does not deny that under the law of Illinois (which governs the substantive issues because the alleged tort occurred there, see 28 U.S.C. §§ 1346(b), 2674), the loss of a chance is compensable. Actually, the ques-

tion is unsettled in Illinois. *Hajian v. Holy Family Hospital,* 273 Ill.App.3d 932, 210 Ill. Dec. 156, 161–62, 652 N.E.2d 1132, 1137–38 (Ill.App.1995). But the government is bound by its concession, and our guess is that the Supreme Court of Illinois, should the question ever be put to it, will answer in favor of liability. A loss is a loss even if it is only probable, as are most things in life. No doubt Murrey would have paid a lot (if he had had a lot to pay) for a 5 percent chance of survival if the alternative was a certainty of immediate death. This shows that he lost something by being deprived of that chance. If 200 people were in Murrey's situation and received improper care, we would expect 10 to have survived if all 200 had received proper care, so that if none of the 200 was entitled to any damages the hospital would have escaped liability for malpractice that had caused a number of deaths in a realistic sense of "cause." Damages for loss of a chance are necessary to prevent the underdeterrence of medical negligence. We add that the issue of informed consent, unlike the issue of negligence in responding to postoperative complications, does not involve the loss of a chance. If Murrey would not have elected surgery had he been given an accurate picture of the choices, he would not have died on November 16.

At 10:00 a.m., doubts about the cause of Murrey's shock having been dispelled, he was ready for surgery. But he was not moved to an operating room until 11:30. The surgery began at noon. The hour and a half delay in getting him to an operating room may have been fatal. He died on the operating table at 3:10 that afternoon. There is disagreement over why it took an hour and a half, rather than a few minutes, to get him to an operating room. There is evidence to support the plaintiff's theory that the time was taken up in finding Murrey's attending physician, pursuant to a rule of the hospital that only the attending physician could authorize surgery. There is also evidence to support the government's theory that the reason for the delay was that all the operating rooms in the hospital that are equipped for the administration of a general anesthetic, of which there are four or five (odd that the exact number was not pinned down at trial), were in use and that it is a rule that an operation may not be interrupted just because another patient has a desperate need for an operation. The evidence that all the operating rooms were occupied during the hour and a half that Murrey was bleeding to death was given by a nurse named Wagner, and the plaintiff objected violently to her being allowed to testify, because her name had not been given in answer to a plaintiff's interrogatory that asked for the names of all the nurses who had "monitored" Murrey's condition on the fatal day. Probably her name should have been given, but she was listed as a witness in the pretrial order and the plaintiff's lawyer had plenty of time to depose her, but failed to do so. It was a judgment call for the district judge whether to let her testify and we cannot say that he abused his discretion in making the call that he did.

The evidence she gave, however, had little bearing on the issue of the hospital's due care without foundation or corroboration never supplied. No evidence was presented that all the operating rooms were occupied by patients who were under a general anesthetic and who could not have been moved without risk to an operating room not equipped for general anesthesia, or that the hospital had made any contingency plan to deal with a surgical emergency (perhaps by arrangement with a nearby hospital) when its limited number of operating rooms were full, or that it is a sound principle of medical practice that all operations are created equal and therefore none may be interrupted even if one could be interrupted at trivial risk to the patient and the interruption would save the life of another patient who is bleeding to death elsewhere in the hospital. Such a principle might be hard to square with the principle of triage, that is, of prioritizing medical care when resources are inadequate to take care of all patients at once. Prostate surgery is risky, especially for elderly patients, as so many of the patients in veterans hospitals are—and this hospital seems to have made a specialty of prostate operations, hardly a surprise considering its clientele. We find it difficult to imagine that such a hospital has no duty to make arrangements for the kind of contin-

gency that arose in this case, where a patient is left to bleed to death either because of a rule requiring the consent of the attending physician regardless of the patient's condition and of whether the attending physician can be located, or because no one has foreseen the possibility of all the operating rooms being in use when another patient needs emergency surgery.

One of the government's witnesses opined that only a hospital that performs "emergency" operations, which is to say a hospital with a trauma center, need have an operating room available at all times for emergency. We shall not conceal our skepticism. Risky surgery performed under nonemergency conditions, such as the operation to remove this elderly and unhealthy man's prostate gland, can be expected in a small but not trivial fraction of cases to produce a postoperative crisis requiring emergency surgery. The failure to foresee and take measures to cope with this possibility strikes us as presumptively negligent.

We need not decide, however, whether the judge's conclusion that the delay in getting Murrey to an operating room was not a result of negligence on the part of the hospital was clearly erroneous, as we suspect. A serious evidentiary error requires a new trial of the issue in any event. Several months after Murrey died, the Secretary of Veterans Affairs, Edward Derwinski, received anonymous letters complaining about patient care at the veterans hospital in North Chicago. At his direction the Inspector General of the Department of Veterans Affairs conducted an investigation of the hospital. The investigation included reviews by several teams of physicians of the medical records of a number of the hospital's patients—including Murrey. The report of the investigation specifically criticized the care that had been provided to Murrey. Several days after receiving the report, Derwinski publicly announced that poor care had contributed to the deaths of six patients at the hospital between June 1989 and March 1990, including Murrey. The department's lawyers informed Murrey's widow personally that his death had been "caused by a medical misadventure" and actually invited her to file an administrative claim against the department under the Tort Claims Act.

The judge gave no weight to these admissions. He was right not to treat them as judicial admissions of liability, which would normally be conclusive. If the answer to a complaint or to a request for admissions admits liability, the defendant cannot then deny liability on the ground that there is evidence that the admission was mistaken. Fed.R.Civ.P. 36(b); *United States v. Kasuboski,* 834 F.2d 1345, 1350 (7th Cir.1987); *Keller v. United States,* 58 F.3d 1194, 1198 n. 8 (7th Cir.1995). A judicial admission trumps evidence. *Tobey v. Extel/JWP, Inc.,* 985 F.2d 330, 333 (7th Cir.1993). This is the basis of the principle that a plaintiff can plead himself out of court. E.g., *Warzon v. Drew,* 60 F.3d 1234, 1239–40 (7th Cir.1995); *Esmail v. Macrane,* 53 F.3d 176, 179 (7th Cir.1995); *Conn v. GATX Terminals Corp.,* 18 F.3d 417, 419 (7th Cir.1994). The statements by Derwinski and by the representatives of the department who spoke with the widow were not judicial admissions; they were not made in a pleading or in a response to a request for admissions. Extrajudicial admissions by a party opponent are admissible as evidence, however. Fed.R.Evid. 801(d)(2); *Keller v. United States, supra,* 58 F.3d at 1198 n. 8. The fact of admission is a badge of reliability sufficient to overcome the hearsay objection to out-of-court statements offered for their truth. People usually don't make damaging admissions unless they are true. Usually, but not always. People sometimes do make mistaken admissions, which is why an extrajudicial admission, not being made with the same deliberateness as a judicial admission, is not conclusive on the issue admitted. But it is evidence.

Murrey's estate wanted the judge to treat the statements by the department and its head as judicial admissions, and the judge was right to refuse. But the plaintiff also wanted him to treat them just as evidence, to be considered with the other evidence in making an overall assessment of negligence. The judge ignored this request. The government argues that this doesn't matter because the plaintiff called as her experts two of the physicians who had reviewed Murrey's rec-

ords for the Department of Veterans Affairs, and the judge found their testimony less persuasive than that of the government's witnesses. The argument overlooks the independent evidentiary significance of the department's statements of *mea culpa.* The admissions that the plaintiff wanted the judge to weigh were not the views of the two physicians—who weren't employed by the department and, having been retained as outside medical auditors, probably weren't any other kind of agent of the department either, so that their statements were not the admissions of a party opponent, Fed.R.Evid. 801(d)(2)(D)—but the assessment placed on these statements by the Department of Veterans Affairs and its head. Whether or not the judge personally found the physicians' criticisms of Murrey's care persuasive, the fact that *the alleged tortfeasor* did so has independent significance. *Casey v. Burns,* 7 Ill.App.2d 316, 129 N.E.2d 440, 445 (Ill.App. 1955). If we may judge from the history of the concealment of government negligence in a variety of settings, the Department of Veterans Affairs was no more likely than a private hospital to admit, either publicly or privately (and it did both), that the medical care which it rendered hastened the death of several patients within a period of months. The fact that it made this admission is some evidence, not conclusive of course, that it really was guilty of malpractice.

The government argues that to give any weight to Secretary Derwinski's admission would violate the rule of Illinois law that expert testimony is required to establish medical malpractice. *Graham v. St. Luke's Hospital,* 46 Ill.App.2d 147, 196 N.E.2d 355, 360–61 (Ill.App.1964). A threshold question is whether the rule is to be considered "substantive" and thus part of the Illinois law of medical malpractice incorporated into the federal law of this case by 28 U.S.C. §§ 1346(b) and 2674, or "procedural" and hence governed by the federal law of procedure and evidence. It is almost certainly the former, because it is a rule limited to a particular area of law and motivated by concerns about the potential impact on primary behavior (here, medical treatment) of making it too easy for plaintiffs to win a particular type of case. (On the general principle, see

*S.A. Healy Co. v. Milwaukee Metropolitan Sewerage District,* 60 F.3d 305, 310 (7th Cir. 1995), and for its application to state laws erecting procedural barriers to medical malpractice plaintiffs, see *Jones v. Griffith,* 870 F.2d 1363, 1368 (7th Cir.1989), and *Hines v. Elkhart General Hospital,* 603 F.2d 646, 648 (7th Cir.1979).) No matter. Expert testimony was offered on behalf of the plaintiff, and there is no rule that the expert testimony offered by the plaintiff in a medical malpractice case cannot be supplemented by other evidence. So obvious is the point that we cannot find a case on it.

■ The government has a back-up argument against the use of this admission—that it would violate the statutory limit of $25,000 on an agency's authority to settle a claim under the Tort Claims Act. 28 U.S.C. § 2672. The argument would have some merit if all admissions made by an agency were treated as judicial admissions, for then by making admissions an agency could effectively bypass the $25,000 limitation; or if they were treated as settlement offers, which Fed.R.Evid. 408 makes inadmissible to prove liability. Even then, so far as the statutory exception is concerned, the admissions would presumably be usable to establish the first $25,000 of liability. (Actually $100,000, because the Attorney General had at the time of the Derwinski admission authorized the Department of Veterans Affairs to settle cases for up to that amount, as he is authorized to do by 28 U.S.C. § 2672. The current maximum is $200,000. 28 C.F.R., Part 14, App. § 1(a).) When the admissions are used only as evidence, the argument collapses. The fact that an agency makes a case more difficult to defend by the Department of Justice because the head of the agency or one of its officers makes damaging admissions is a peril of litigation, not an unauthorized settlement offer.

■ Since the question of the hospital's negligence in treating Murrey's hemorrhagic shock was so close, the judge's error in excluding the evidence of admissions cannot be regarded as harmless, and so the negligence issue must be retried along with the issue of informed consent. The error did not, howev-

er, affect the judge's determination, which we have said was not clearly erroneous, that Murrey's death was not the result of negligence in the operation itself. So no retrial of that issue is warranted. For the further guidance of the parties on remand, we point out that the damages requested—more than $3.5 million—obviously are excessive (and by a considerable multiple, in the case of the lost-chance damages), since the government is not liable for punitive damages.

REVERSED AND REMANDED.