**Peter G. KOHLER and Walter J. Kohler,
Plaintiffs–Appellants,**

v.

**LESLIE HINDMAN, INC., an Illinois
corporation, and Richard M. Thune,
Defendants–Appellees.**

No. 95–1752.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 20, 1995.

Decided April 5, 1996.

Charles F. Marino, David M. Marino (argued), Chicago, IL, for Peter G. Kohler, Walter J. Kohler.

Donald C. Battaglia (argued), Wildman, Harrold, Allen & Dixon, Chicago, IL, for Leslie Hindman.

Eugene E. Gozdecki, David S. Americus (argued), Richard A. DelGiudice, Gozdecki & DelGiudice, Chicago, IL, for Richard M. Thune.

Before CUDAHY, EASTERBROOK, and RIPPLE, Circuit Judges.

CUDAHY, Circuit Judge.

An artist once produced a painting now called "The Plains of Meudon." For a while, the parties in this case thought that the artist was Theodore Rousseau, a prominent member of the Barbizon school, and that the painting was quite valuable. With this idea in mind, the Kohlers consigned the painting to Leslie Hindman, Inc., an auction house, and Richard Thune bought it at auction for $90,000 on the condition that it was, in fact, a Rousseau. It was not. The parties then pursued a lawsuit in the district court to determine who would get stuck with it. Upon a motion for summary judgment, the district court held that, as a matter of law, the contracts between the parties required that the Kohlers keep the painting. The Kohlers contend that the district court erred in its interpretation of the contracts, and they appeal. We affirm.

## Background

The Kohlers inherited the painting from their mother, Dorothy Dings Kohler, in 1989. Two years later, they decided to sell it along with some other artwork from their mother's estate, and they contacted Leslie Hindman Auctioneers (Hindman, Inc.). After arranging for the inspection of the artwork, Leslie Hindman, president of her eponymous auction house, met with the Kohlers and discussed the terms by which her company would sell it at auction. Hindman, Inc. and the Kohlers then entered into a consignment agreement which made the company the Kohlers' agent for the auction sale.

Among other things, the consignment agreement defined the scope of Hindman, Inc.'s authority as agent. Two aspects of that authority concern us here. First, Hindman, Inc. was obliged to sell the painting according to the conditions of sale spelled out in the auction catalog. Those conditions provided that neither the consignors nor Hindman, Inc. made any warranties of authenticity. Indeed, the conditions emphasized that "[a]ll lots are sold 'AS IS,'" and one provision of the conditions asserted that "[n]o statement anywhere, whether oral or written, shall be deemed" to be a warranty of authenticity. The conditions also provided that Hindman, Inc. would insure that title to all lots passed with the fall of the auctioneer's hammer. In addition to these prescriptions, another provision of the consignment agreement gave the company extensive and exclusive discretionary authority to cancel sales. In Paragraph 14 of the consignment agreement, Hindman, Inc. declared that

We are authorized as your agent to accept the return and rescind the sale of any [p]roperty if we at any time in our sole discretion determine that the offering for sale of any [p]roperty has subjected us and/or you to any liability under a warranty of authenticity.

Along with the other artwork from the Dorothy Dings Kohler estate, Hindman, Inc. listed the painting in its auction catalog, noting that the painting was, in its best judgment, by Rousseau. Hindman, Inc. also displayed the painting at a pre-auction showing where Thune's agent, Simon Parkes, saw it and developed some doubts about its authenticity. He expressed those doubts to his principal and to Scot Campbell, an employee of Hindman, Inc. Campbell relayed Parkes' suspicions to Ms. Hindman, who was soon in touch with Thune. Thune was still interested in the painting, but he wanted to have it authenticated before committing to its purchase. Unable to obtain an authoritative opinion about its authenticity before the auction, Ms. Hindman and Thune made a verbal agreement that Thune could return the painting within approximately thirty days of the auction if he was the successful bidder and if an expert then determined that Rousseau had not painted it. Neither Ms. Hind-

man nor anyone else at Hindman, Inc. told the Kohlers about the questions concerning the painting or about the side agreement between Thune and Hindman, Inc.

At the auction on October 13, 1991, Thune prevailed in the bidding with a high bid of $90,000, and he took possession of the painting without paying. He then sent it to an expert in Paris who decided that it was not a Rousseau. Thune returned the painting to Hindman, Inc. in March 1992.

The Kohlers sued both Hindman, Inc. and Thune. They claimed that Hindman, Inc. had breached the consignment agreement with them and its fiduciary duty to them and had committed constructive fraud and conversion. They also claimed that they had a implied contract with Thune himself for the painting, and that Thune had breached that contract by failing to pay the $90,000. Hindman, Inc. and Thune each made various claims of their own.

After the district court dismissed the conversion claim, the parties made cross-motions for summary judgment on all of the remaining claims. The district court ruled that Hindman, Inc. and Thune were entitled to judgment on all of the Kohlers' claims against them. The Kohlers appeal that ruling.

## Discussion

We review a district court's summary judgment rulings de novo, applying the same standards as the district court. *Illinois Conf. of Teamsters and Employers Welfare Fund v. Steve Gilbert Trucking*, 71 F.3d 1361, 1364 (7th Cir.1995). A district court should grant a party's motion for summary judgment when the record shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

The parties here do not dispute the relevant facts; therefore our review focuses on the district court's application of the law to those facts. Because this is an action within the district court's diversity jurisdiction, Illinois' choice of law rules determine the applicable substantive law. *Klaxon Co.*

v. *Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). In disputes such as this one that arise from a contract, Illinois law respects the contract's choice-of-law clause as long as the contract is valid. *Vencor, Inc. v. Webb,* 33 F.3d 840, 844 (7th Cir.1994). The Kohlers and Hindman, Inc. do not dispute the validity of their consignment agreement, and that agreement provides that their disputes should be governed by Illinois law. Therefore, all of the Kohlers' claims against Hindman, Inc. must be resolved in accordance with Illinois law, as will the Kohlers' claim against Thune since it ultimately depends upon the interpretation of their contract with Hindman, Inc.

Indeed, all of the Kohlers' claims depend upon how the consignment agreement defined the scope of Hindman, Inc.'s authority as the Kohlers' agent. If Hindman, Inc. acted at all times within its authority, the Kohlers cannot prevail on any of their claims. Defining the scope of that authority requires an interpretation of the consignment agreement.

As a preliminary matter, however, the Kohlers argue that we do not need to interpret the contract at all because Hindman, Inc. has judicially admitted its liability for breach of contract. They contend that the district court erred in excluding this admission, which they regard as dispositive, from the summary judgment record.

The putative judicial admission is a statement that Leslie Hindman made during her deposition in a lawsuit brought by a different plaintiff in Illinois state court. At the deposition, Ms. Hindman was asked a series of questions about Thune's return of the painting, and, in response to one, she asserted that "Mr. Kohler knows that per our conditions of sale he, by right, should be paid."

This certainly is an admission, but it is not a judicial admission. When a party in a lawsuit makes an admission in its pleadings or in its answer to a request for admissions, it makes a judicial admission that can determine the outcome of that lawsuit. Fed. R.Civ.P. 36(b); *Murrey v. United States,* 73 F.3d 1448, 1455 (7th Cir.1996). But a statement made in one lawsuit cannot be a judicial admission in another. *See id.* It can be

*evidence* in the other lawsuit, but no more. *See id.* Ms. Hindman's statement in her state court suit is not even competent evidence in this case because it states a legal conclusion and is not the admission of a fact that could be dispositive.

Of course, the Kohlers have other arguments. They proffer an interpretation of the consignment agreement that would put Hindman, Inc. in breach. They contend that the agreement made Hindman, Inc. powerless to do anything other than sell the painting "as is." They point out that the consignment agreement bound Hindman, Inc. to the terms of the auction catalog's conditions of sale, and those conditions informed prospective buyers that Hindman, Inc. sold every item "as is" and absolutely disclaimed all warranties of authenticity. The conditions also provided that high bidders would take title at the fall of the hammer. The Kohlers argue that the combination of these provisions clearly make the dealings of Hindman, Inc. with Thune unauthorized. The pre-auction side agreement with Thune was equivalent to a warranty of authenticity, which Hindman, Inc. promised not to make; and the rescission effected after the sale violated Hindman, Inc.'s duty to make the title to the painting pass with the fall of the hammer. The Kohlers acknowledge that Paragraph 14 of the consignment agreement did give Hindman, Inc. the authority to rescind sales in the face of a threat of liability under a warranty of authenticity, but they maintain that this authority could not have come into play here. Because the auction catalog contained such absolute disclaimers, the Kohlers believe that Hindman, Inc. could not possibly have faced any realistic threat of warranty liability. Consequently, they argue that Paragraph 14's authority had not been activated here.

The district court ruled that Hindman, Inc.'s authority to rescind was more expansive than the Kohlers thought and that Hindman, Inc. had acted within the scope of that authority. In its arguments, Hindman, Inc. unsurprisingly expresses complete agreement with this ruling and the reasoning behind it.

The district court focused on Paragraph 14 of the consignment agreement, which authorized Hindman, Inc. to rescind a sale when the company, in its "sole discretion," determined that it or its consignor was subject to liability under a warranty of authenticity. The district court concluded that this grant of discretion allowed Hindman, Inc. to rescind a sale whenever it perceived the threat of such liability, notwithstanding the auction catalog's emphatic disclaimers. In the district court's reading of the consignment agreement, once the questions about the authenticity of the painting arose, Hindman, Inc. had open-ended authority to avoid a lawsuit arising from a claim under a warranty of authenticity. Hindman, Inc. had the power to rescind or to make a conditional promise to rescind in side agreements with prospective buyers. The district court noted that such a side agreement was equivalent to a warranty of authenticity and would constitute a technical breach of Hindman, Inc.'s promise to adhere to the conditions of sale. But the district court reasoned that making a conditional promise to rescind was not a material breach because it was consistent with the exercise of the company's sole discretion to rescind.

The district court's decision emerged from the proper inquiry, and we must determine whether it correctly answered the questions it asked. Ultimately, we must determine the extent of Hindman, Inc.'s discretion to determine when it needed to exercise its authority to rescind a sale. If Hindman, Inc. had the sole discretion to decide to rescind a sale, then it had the authority to make a conditional promise to rescind. If Hindman, Inc. received this discretionary authority to rescind as a product of its bargain with the Kohlers, then its promise to rescind under certain conditions is not inconsistent with the bargained-for objectives of the consignment agreement. Under Illinois law, this means that the conditional promise to rescind would not breach the consignment agreement even if it has the same effect as a warranty of authenticity. See *Sahadi v. Continental Illinois Nat'l Bank & Trust Co.*, 706 F.2d 193, 196 (7th Cir.1983) (applying Illinois law).

■ Determining the extent of Hindman, Inc.'s authority to rescind is difficult. The Kohlers' brief suggests a powerful argument: a holding that Hindman, Inc. had unlimited authority to rescind would undermine most of the specified limitations on the other aspects of the auctioneer's authority. Because Illinois law requires that contracts be interpreted so that all of their provisions be given effect, we cannot conclude that Paragraph 14 vitiates the rest of the consignment agreement. See *In re Halas*, 104 Ill.2d 83, 83 Ill.Dec. 540, 544, 470 N.E.2d 960, 964 (1984). But neither can we ignore that paragraph's reference to "sole discretion." Therefore, we must determine the limits of the discretion that emerged from the consignment agreement.

■ Interpretation would be easier if we could find a customary meaning for "sole discretion" as used in auctioneers' consignment agreements. Unfortunately, our research has not revealed any Illinois case law on this point. But the ruling of a federal district court in New York can give us some guidance. In *Greenwood v. Koven*, 880 F.Supp. 186 (S.D.N.Y.1995), that court considered the extent of an auctioneer's authority under a consignment agreement with a provision like Paragraph 14. The district court there found that such a contract provision is highly analogous to a satisfaction clause (typically conditioning one party's performance on that party's satisfaction with the other party's performance). 880 F.Supp. at 198–99. Through a satisfaction clause, a party's exercise of judgment or discretion is a condition for its duty to perform. *See* 3A Arthur L. Corbin, Corbin on Contracts § 646 (1960); 2 E. Allen Farnsworth, Farnsworth on Contracts § 8.4 (1990). Because satisfaction clauses involve the same principles of contract law as apply here, we will treat Paragraph 14 as a satisfaction clause.

■ Illinois courts have developed rules for interpreting satisfaction clauses that require a classification. Thus, satisfaction clauses in Illinois come in two categories: those that make the exercise of discretion purely subjective and those that require the exercise of discretion according to objective factors. *Union League Club v. Blymyer Ice*

*Mach. Co.*, 204 Ill. 117, 68 N.E. 409, 412–13 (1903); *Forman v. Benson*, 112 Ill.App.3d 1070, 68 Ill.Dec. 629, 632, 446 N.E.2d 535, 538 (1983). The first category includes satisfaction clauses invoking the feelings, taste or judgment of the party exercising discretion. *Forman*, 68 Ill.Dec. at 632, 446 N.E.2d at 538; *see also* Corbin, at § 646. When a satisfaction clause conveys this sort of subjective discretion, it does not, however, remove all limitations on the exercise of discretion. The party that has the right to act according to its personal judgment or within its sole discretion must still act in good faith. *Forman*, 68 Ill.Dec. at 634, 446 N.E.2d at 540.

▇ On the other hand, a satisfaction clause may fall into the second category when it involves matters susceptible to objective evaluation; mechanical utility is a stereotype of such matters. *Id.* at 632, 446 N.E.2d at 538; *see also* Corbin, at § 646. When objective considerations control the exercise of discretion, the party to be satisfied must exercise its authority in a just and reasonable way. *Forman*, 68 Ill.Dec. at 632, 446 N.E.2d at 538.

These rules do not apply easily to Paragraph 14. By giving Hindman, Inc. "sole discretion," this provision suggests that the consignment agreement had defined Hindman, Inc.'s authority subjectively. The consignment agreement did not define any objective criteria that would control Hindman, Inc.'s exercise of judgment. Nevertheless, the object of Hindman, Inc.'s discretion was not a purely subjective phenomenon like taste or feeling. Rather, Hindman, Inc. had to evaluate risk, and demanding such an evaluation impliedly invoked rational analysis. The Kohlers were not giving Hindman, Inc. a contract right to emulate Chicken Little. Viewing all of these conditions together, the grant of "sole discretion" to assess risk is somewhat ambiguous as between objective and subjective satisfaction.

▇ Ultimately, for lack of objective criteria, we must conclude that Hindman, Inc.'s exercise of its authority is bounded only by its satisfaction as limited, of course, by good faith. The principal factor leading us to this · conclusion is the agreement's use of the phrase "sole discretion." This phrase denotes subjectivity. Moreover, this conclusion corresponds with the theoretical understanding of contract bargaining. The consignment agreement made the interests of the Kohlers and Hindman, Inc. largely coincident. The Kohlers and Hindman, Inc. would each profit most from the same set of circumstances, namely the sale of the painting for the highest possible price. Given this identity of interests, the Kohlers could trust Hindman, Inc.'s subjective decision-making. For the purposes of analyzing the risk of liability, Hindman, Inc. and the Kohlers had the same perspective. Therefore, the Kohlers did not have to hold Hindman, Inc. to some external standard as a means of making the auctioneer's interests coincide with its own. At least in theory, it would be rational for the Kohlers to accept Hindman, Inc.'s good-faith subjective judgments as part of a bargain. Because the language of the contract clearly implies that the Kohlers did trust Hindman, Inc.'s subjective judgment, we conclude the consignment agreement held the auctioneer to a subjective standard.

▇ Hindman, Inc.'s actions towards Thune, before and after the auction, meet the standard of good faith. The Kohlers contend that the side agreement and the subsequent rescission were entirely self-interested acts. In making this contention, they emphasize that no-one in the auction house informed them of the doubts about the painting's authenticity or about the negotiations with Thune. They seem to think that this lack of disclosure reflects a consciousness of guilt, or perhaps more precisely, a consciousness of pure self-interest. This contention, however, defies the logic of the consignment agreement. The consignment agreement created one overriding interest that was identical for both the Kohlers and Hindman, Inc. Therefore, anything that Hindman, Inc. did for itself, it apparently also did for the Kohlers.

It is true that the parties' interests were opposed in one respect: under Paragraph 10 of the consignment agreement, the Kohlers would have to pay Hindman, Inc. 20% of the auctioneer's most recent pre-sale estimate and the auctioneer's expenses if the Kohlers withdrew the painting from sale on account of doubts about its authenticity. Thus, Hind-

man, Inc. had some interest in promoting withdrawal because it could profit at the Kohlers' expense if doubts about the painting became so widespread that its sale at auction were no longer feasible. With respect to this interest, however, Hindman, Inc. apparently acted selflessly. Telling the Kohlers about Thune's doubts before the sale might have actually advanced Hindman, Inc.'s interests because the information might have given the Kohlers an incentive to withdraw. And even if the Kohlers had not decided to withdraw, the side agreement might still have been their best option. Under the side agreement, Hindman, Inc. maintained Thune's incentive to bid as if the painting were really a Rousseau; therefore it maximized the chances of a lucrative result for the auction. This was indeed an act of good faith, and it was made within the limits of Hindman, Inc.'s authority under the consignment agreement. The district court correctly ruled that Hindman, Inc. had not breached the consignment agreement.

 This conclusion permits the easy resolution of the other issues that the Kohlers raise. Our conclusion that Hindman, Inc. acted in good faith means, of course, that the auctioneer did not breach its fiduciary duty. It also means that there was no constructive fraud. Under Illinois law, a breach of duty, especially fiduciary duty, is an essential element of a claim of constructive fraud. *Beaton & Assocs., Ltd. v. Joslyn Mfg. & Supply Co.*, 159 Ill.App.3d 834, 111 Ill.Dec. 649, 654, 512 N.E.2d 1286, 1291 (1987). Because Hindman, Inc. breached no duty, the Kohlers cannot claim that it committed constructive fraud. Finally, the Kohlers cannot claim that they have a implied agreement with Thune for the sale of the painting at $90,000. Such a implied contract would exist only if the side agreement were invalid. Because Hindman, Inc. made the side agreement within the scope of its authority, that agreement is valid, and it protects Thune from the Kohlers' reach.

For these reasons, the judgment of the district court is

AFFIRMED.