**UNITED STATES COURT OF APPEALS**

**May 1, 2018**

**TENTH CIRCUIT**

HELEN BENALLY,

        Plaintiff - Appellant,

v.

UNITED STATES OF AMERICA,

        Defendant - Appellee.

No. 16-2177
(D.C. No. 1:13-CV-00604-MV-SMV)
(D.N.M.)

---

**ORDER AND JUDGMENT**[*]

---

Before **HOLMES**, **PHILLIPS**, and **MORITZ**, Circuit Judges.

---

Following orthopedic surgery for a fractured femur at a federal medical

facility operated by the U.S. Department of Health and Human Services ("HHS"),

Helen Benally filed tort-claim notices with HHS—an initial form, followed by an

amended form—claiming that the facility "performed" the surgery "negligently"

and "below the standard of care." HHS denied her administrative claim, and Ms.

Benally brought a medical-negligence suit for lack of informed consent, surgical

negligence, and negligent post-operative care. Asserting that Ms. Benally failed to

---

[*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

raise the issues of informed consent and post-operative negligence in her administrative notices, the government moved to dismiss those claims under the presentation requirement of the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2675(a). The district court subsequently dismissed the informed-consent and post-operative negligence claims for lack of subject-matter jurisdiction, and Ms. Benally appeals.

Exercising jurisdiction under 28 U.S.C. § 1291, we **affirm** the district court's judgment dismissing Ms. Benally's complaint for lack of subject-matter jurisdiction.

# I

## A

On November 23, 2008, Ms. Benally had "open reduction/internal fixation" surgery at Gallup Indian Medical Center ("GIMC"), a medical facility that HHS operates through the Indian Health Service ("IHS").[1] Aplt.'s App. at 14 (Compl., filed June 28, 2013). The surgery aimed to repair Ms. Benally's fractured femur by using "a plate and screws to hold the bone fragments in place and [to] give proper alignment to the upper femur." *Id.* Although Ms. Benally's "pain and other symptoms improved somewhat" after discharge, her condition rapidly deteriorated shortly thereafter, *id.*, and she ultimately received a "total hip

---

[1]      As a tribal member of the Navajo Nation, Ms. Benally accessed healthcare through the IHS.

2

replacement" from a different facility—the University of New Mexico Hospital ("UNMH"), *id.* at 15.

During this period of deterioration, Ms. Benally had at least five follow-up appointments with Dr. David Poe ("Dr. Poe"), the GIMC surgeon who performed her operation.[2] At her first follow-up appointment on December 16, 2008, Dr. Poe reported apparently normal findings. However, by her second appointment on March 30, 2009, Ms. Benally was complaining of increased pain.[3] Ms. Benally had x-rays taken of her hip and pelvis; they revealed "a possible problem with [the] alignment of the femur fragments that had been secured with a plate and screws." *Id.* Rather than provide a definitive diagnosis, however, Dr. Poe instructed Ms. Benally to return in about eight weeks.

After that, Ms. Benally received additional post-operative care from Dr. Poe on three more occasions—August 8, 2009, March 18, 2010, and June 17, 2010. Dr. Poe's evaluative notes from these later appointments reference "failed pinning" and "lots of pain," but the notes contain no indication that Dr. Poe discussed the need for further surgery. *Id.* at 116 (PCC Ambulatory Encounter

---

[2] As detailed *infra*, Ms. Benally's notices made no mention of Dr. Poe or his role in her pre- or post-operative care.

[3] Between these follow-up appointments, Ms. Benally raised additional pain-related complaints to medical providers at Northern Navajo Medical Center ("NNMC"), another facility that HHS operated. The record contains scant details concerning these medical visits, but because Ms. Benally makes no claim about NNMC's care, her treatment at that facility has no impact on our disposition of this appeal.

3

Record, dated June 17, 2010); *accord id.* at 103 (PCC Ambulatory Encounter Record, dated Aug. 6, 2009); *id.* at 115 (PCC Ambulatory Encounter Record, dated Mar. 18, 2010). Rather, Dr. Poe prescribed pain medication, directed Ms. Benally to take Vitamin D supplements, and scheduled regular follow-up appointments at three-month intervals. *See id.* at 112–13 (Aff. of Helen Benally, dated Jan. 19, 2015).

Nonetheless, the surgical hardware—a pin, a plate, and some screws—"had [in fact] failed [completely], torn through the bone," and ceased to "maintain[] a proper alignment." *Id.* at 15. And, due to that failure, Ms. Benally experienced "a progressive movement of the two-large [femur] fragments from a fixed position to a non-union condition." *Id.* Consequently, after "approval from contract care," Ms. Benally received "a total left hip replacement" at UNMH on July 17, 2010. *Id.* at 113. Although the hip-replacement operation proved successful, Ms. Benally "continues to have problems related to the failed femur surgery." *Id.* at 15.

**B**

Following these events, Ms. Benally filed two, highly similar tort-claim, administrative notices with HHS: an initial, handwritten form submitted on March 8, 2011, and an amended, typed form submitted on May 7, 2012. In the first notice, filed pro se, Ms. Benally stated:

> On November 23, or thereabouts, Helen Benally underwent

4

surgery at the Gallup Indian Medical Center in New Mexico. She had a total hip replacement (left hip). The new hip failed after some months passed. The hip replacement equipment gave way & separated, causing severe pain and serious mobility problems. The surgery at GIMC was performed negligently, below the standard of care. Further surgery became necessary. Permanent damage.

*Id.* at 271 (Form 95, signed Mar. 8, 2011). Ms. Benally's attorney filed the second (amended) notice, nearly fourteen months later. It described the basis for Ms. Benally's claim in similar terms, explaining:

On November 23, 2008, or thereabout, Helen Benally underwent surgery on her left hip . . . at the Gallup Indian Medical Center in New Mexico. Ms. Benally's left hip surgery was mishandled causing Ms. Benally severe pain and serious mobility programs. [sic] The surgery at GIMC was performed negligently and below the standard of care, causing permanent damage. Further surgery became necessary.

*Id.* at 272 (Form 95, submitted May 7, 2012).[4] Whether taken together or read in isolation,[5] Ms. Benally's notices narrowly focused on one event: her November 23,

---

[4]    Ms. Benally's initial notice described the surgery as "a total hip replacement (left hip)," Aplt.'s App. at 271, while her amended notice described only "her left hip surgery," *id.* at 272. Ms. Benally's subsequent civil complaint identified the operation as "an open reduction/internal fixation." *Id.* at 14.

[5]    The parties' appellate briefing draws no legal distinction between Ms. Benally's initial and amended notices, nor explains the effect of the amendment on her initial notice. Rather, the parties' briefing tacitly assumes that the initial and amended notices should be ready together—*viz.*, it tacitly assumes that they are both proper subjects of our review in discerning whether Ms. Benally has satisfied the FTCA's presentation requirement. Their briefing simply offers competing interpretations of both notices. At oral argument, in response to a question from the panel, the government indicated that, as a matter of law, the amended notice superseded the initial one, but acknowledged that there was not a "huge difference" between them. Oral Arg. at

(continued...)

2008 surgery. Indeed, each notice explained that Ms. Benally had a hip operation at GIMC that caused subsequent pain, and then asserted, based on that limited factual universe, that "[t]he *surgery* was performed negligently" and "below the standard of care." *Id.* (emphasis added); *accord id.* at 271. Thus, despite Ms. Benally's extensive, nearly two-year treatment with GIMC, she made no mention of pre-operative care, post-operative care, or Dr. Poe and his involvement in these phases of her treatment. Rather, she expressed concerns only with the manner in which GIMC performed her surgery. HHS reportedly denied Ms. Benally's claim by letter dated February 11, 2013.[6]

## C

Ms. Benally subsequently filed suit in federal court, and her civil complaint painted a markedly different—and far broader—picture of her injuries and the source of them. Ms. Benally's complaint asserted a single count of negligence, particularized by a lengthy series of allegedly "negligent actions and omissions" by Dr. Poe—beginning with his pre-operative care and consultation, continuing to his surgical techniques, and concluding with attacks on the scope of his post-

[5](...continued)
22:21–25. Given the shared approach of the parties' briefing, we will assume without deciding that our review properly extends in this case to both notices. The government's belated, oral-argument suggestion to the contrary does not persuade us to take a different approach. *See, e.g.*, *Fed. Ins. Co. v. Tri-State Ins. Co.*, 157 F.3d 800, 805 (10th Cir. 1998) ("Issues raised for the first time at oral argument are considered waived.").

[6] In their briefing, the parties agree on the date of the denial, but the parties failed to include the denial letter as part of the record on appeal.

operative care. *Id.* at 16–17. These "negligent actions and omissions" specifically included:

> (a)     failing to present alternative choices, i.e., a total hip arthroplasty, to Ms. Benally prior to her surgery on November 23, 2008;[7]
>
> (b)     failing to include in the informed consent for surgery that the fixation device could cut out of the bone, resulting in a failure to heal and a need for further surgery;
>
> (c)     failing to employ proper surgical techniques when attempting a fixation of the left femur fracture;
>
> (d)     failing to inform Ms. Benally of the potential failure of the fixation when she met with Dr. Poe on December 16, 2008;
>
> (e)     failing to have Ms. Benally return within a reasonable period of time following surgery to determine whether or not there would be further collapse;
>
> (f)     failing to explain to Ms. Benally on March 30, 2009, that the pin was more displaced and that there was further bone destruction;

---

[7]     The government claims that the district court's July 15, 2015, order entering partial summary judgment on Ms. Benally's "medical malpractice" claim disposed of this allegation. *See* Aplee.'s Response Br. at 7 n.6; *see also* Aplt.'s App. at 246–60 (Mem. Op. & Order, filed July 15, 2015). The government, however, misreads the relevant aspect of the district court's opinion. Importantly, the district court found the government "entitled to judgment as a matter of law that the selection of femur surgery that Dr. Poe performed on Benally did not breach the standard of care," *id.* at 255, not on the issue of whether Dr. Poe adequately informed Ms. Benally of alternative choices to femur surgery. Indeed, the district court specifically declined to enter summary judgment on the issue of informed consent, because although Ms. "Benally may have consented to the procedure that Dr. Poe performed," the record created the impression that "she did so without a discussion of the relevant array of surgical alternatives, such as a total hip replacement." *Id.* at 256.

7

(g)     failing on March 30, 2009, to schedule Ms. Benally for surgery, instead prescribing pain medication;

(h)     failing on March 30, 2009, to schedule a return visit within a reasonable amount of time to determine the further status of the fixation failure and to decide upon a course of action;

(i)     failing on August 6, 2009, to refer Ms. Benally for a second opinion at a facility better able to determine the appropriate treatment for her nonunion and fixation failure; [and]

(j)     failing on March 18, 2010, to refer Ms. Benally for a second opinion at a facility better able to determine the appropriate treatment for her displaced bone fragments and the bone destruction caused by the fixation device.

*Id.*

## D

Following the district court's entry of partial summary judgment in the government's favor on matters that are not currently before us,[8] the government filed motions to dismiss the informed-consent and post-operative-care aspects of Ms. Benally's complaint for failure to provide notice of these allegations as the FTCA requires. Finding that Ms. Benally's notices "d[id] not implicate the issue of informed consent," *id.* at 296 (Mem. Op. & Order, filed Oct. 22, 2015), and

---

[8]     On July 15, 2015, the district court found the government entitled to summary judgment on Ms. Benally's allegations "that the selection of femur surgery . . . breach[ed] the standard of care," Aplt.'s App. at 255, and that "Dr. Poe employed [in]appropriate surgical techniques," *id.* at 256 (capitalization omitted). Ms. Benally mounts no challenge to these determination on appeal.

"fail[ed] to state any facts . . . regarding her postsurgical care," *id.* at 339 (quoting the record) (Mem. Op. & Order, filed May 20, 2016), the district court dismissed the remainder of her complaint for lack of subject-matter jurisdiction. Ms. Benally's appeal followed: it challenges only the sufficiency of her notices under the FTCA's presentation requirement. We review the district court's ruling on this sufficiency question de novo. *See, e.g.*, *Staggs v. United States ex rel. Dep't Health & Human Servs.*, 425 F.3d 881, 884 (10th Cir. 2005) (noting that sufficiency "presents a question of law subject to de novo review").

## II

The FTCA's jurisdictional statute, 28 U.S.C. § 2675(a), requires a would-be tort plaintiff to file "(1) a written statement sufficiently describing the injury to enable the agency to begin its own investigation, and (2) a sum certain damages claim." *Lopez v. United States*, 823 F.3d 970, 976 (10th Cir. 2016) (quoting *Estate of Trentadue ex rel. Aguilar v. United States*, 397 F.3d 840, 852 (10th Cir. 2005)). The FTCA's "eminently pragmatic" written, claim-presentation requirement requires that the written statement provide "*due notice* that the agency should investigate the possibility of *particular* (potentially tortious) conduct." *Trentadue*, 397 F.3d at 852 (emphases added) (quoting *Dynamic Image Techs., Inc. v. United States*, 221 F.3d 34, 40 (1st Cir. 2000)).

In other words, the notice must describe "the facts and circumstances underlying a claim"—"rather than the exact grounds"—"upon which [the] plaintiff

9

seeks to hold the government liable." *Id.* at 853. Thus, it "should give *notice* of the *underlying facts and circumstances*" that will form the fabric of the subsequent civil suit, *Staggs*, 425 F.3d at 884 (emphases added).

Reinforcing the facts-and-circumstances focus of the presentation requirement, we recently endorsed a sibling circuit's explanation that an FTCA notice should be read to "encompass[] any cause of action *fairly implicit* in the facts." *Lopez*, 823 F.3d at 976 (emphasis added) (quoting *Murrey v. United States*, 73 F.3d 1448, 1452 (7th Cir. 1996)). *Lopez* underscores the long-held understanding that courts should liberally construe the universe of facts that the FTCA claimant provides.[9] That does not mean, however, that courts should augment those facts to conform to the claimant's subsequent civil complaint. *See Staggs*, 425 F.3d at 885 ("We recognize the tragic circumstances of this case and that our decision provides little solace . . . . However, the FTCA's presentation requirements are jurisdictional and cannot be waived.").

**III**

Relying on the liberal construction of administrative claims,[10] Ms. Benally

---

[9] Ms. Benally points to *United States v. Kwai Fun Wong*, --- U.S. ----, 135 S. Ct. 1625 (2015) for the same general notion. *See* Aplt.'s Reply Br. at 10 (explaining that Ms. Benally "cited *Wong* for the proposition that overly narrow construction of the FTCA is prohibited"). The parties, however, agree that the principal, equitable-tolling holding of *Wong* has no relevance here.

[10] Ms. Benally also underscores that we should consider "the small amount of space" allotted on the government claim form to describe a

(continued...)

10

argues that her tort-claim notices sufficiently put the government (i.e., HHS) on notice regarding her claims for negligent post-operative care and lack of informed consent. We disagree. Accordingly, we uphold the district court's dismissal of these aspects of Ms. Benally's complaint for lack of subject-matter jurisdiction.

## A

Turning first to the issue of post-operative care, Ms. Benally raises two arguments—one rooted in the substance of her notices, and the other based on her view of the relevant legal landscape. More specifically, Ms. Benally first posits that her description in the notices of "the hardware fail[ure] months after the surgery[] clearly put[] the Government on notice and provid[ed] a factual basis" for her post-operative care claim. Aplt.'s Opening Br. at 20; *accord id.* at 14; Aplt.'s Reply Br. at 4. Second, Ms. Benally argues that, irrespective of whether the notices explicitly detail a claim for post-operative care, "a medical negligence claim" "encompasse[s]," as a matter of law, "*both* negligent surgery and negligent aftercare." Aplt.'s Reply Br. at 6 (emphasis added). The government argues, by contrast, that Ms. "Benally failed to mention anything in her [tort-claim] forms

---

[10](...continued)
claim—labeling the form "skeletal"—and her initial pro se status. Aplt.'s Opening Br. at 12; *accord id.* at 1 (discussing "the approximately 1.5 inch space provided on the government form for the description of the basis of the claim"). However, these fleeting assertions merit little response: the tort claim form plainly permits claimants to "[u]se additional pages if necessary," Aplt.'s App. at 271, and after filing her initial notice, Ms. Benally has proceeded in this matter with counsel, who filed an amended notice that we also consider here, along with the initial one.

11

about the post-operative care, and as such[,] . . . failed to exhaust those claims, depriving the district court of subject matter jurisdiction." Aplee.'s Response Br. at 26. Rejecting each of Ms. Benally's arguments, we conclude that her notices failed to exhaust her claim of negligent post-operative care.

**1**

Reciting her statements that the hip hardware "gave way & separated" "some months" after the surgery, and that the "fail[ure]" "caus[ed] severe pain and serious mobility problems," Aplt.'s App. at 271; *see also* Aplt.'s Reply Br. at 3, Ms. Benally reasons that she "told [HHS] the starting point and ending point for the investigation" and "clearly convey[ed] that the failure of the hardware during the post-operative care period needed to be part of the investigation." Aplt.'s Opening Br. at 15. In other words, Ms. Benally claims that she "causally connected the surgery and the injury months later," *id.*, making it "'fairly implicit' that [her] claim covered negligence in the post-operative period . . . [and also] from the surgery," Aplt.'s Reply Br. at 4. We disagree.

Ms. Benally's position relies exclusively on her initial notice's reference to a "surgery and [then] injury months later," Aplt.'s Opening Br. at 15, all while ignoring the context—i.e., the facts and circumstances—surrounding that assertion. Importantly, Ms. Benally's notices emphasized *only* that GIMC "*performed*" the "*surgery*" "negligently" and "below the standard of care," Aplt.'s App. at 271–72 (emphases added); it did not expressly convey that she intended to

12

challenge the post-operative care that she received—specifically, from Dr. Poe. Her notices, for example, made no reference to post-operative care or Dr. Poe, much less suggested negligent conduct by Dr. Poe during that post-operative period. Similarly, the notices included no mention of the various follow-up appointments she attacks in her complaint, nor did they indicate any objection to the medical opinions that she received from Dr. Poe during those visits.

Nevertheless, Ms. Benally claims that her simple reference in her initial notice to an equipment failure following her surgery gave the government ample basis to divine that her administrative claim "covered negligence in the post-operative period . . . [and also] from the surgery." Aplt.'s Reply Br. at 4. However, Ms. Benally's initial notice—even under the most generous reading—described only the *consequences* of the negligent surgery that formed the basis of her claim; it did not express a distinct concern regarding the nature or adequacy of her post-operative care. The text of her initial notice confirms this conclusion. Ms. Benally's notice included the following narrative: that she "underwent [hip] surgery," that "[t]he new hip failed after some months passed," and that "[t]he hip replacement equipment gave way & separated, causing severe pain and serious mobility problems." Aplt.'s App. at 271. Conspicuously absent from this account is any mention of Dr. Poe or, more generally, any conduct amounting to post-operative negligence committed by anyone. Significantly, there is no assertion that post-operative negligence caused any of the alleged adverse

13

events (e.g., the equipment failure or the mobility problems). Rather, Ms. Benally simply offered in her initial administrative notice the assertion that "[t]he *surgery* . . . was performed negligently, below the standard of care." *Id.* (emphasis added).

Moreover, her amended notice did nothing to alter the foundation for her claim. It omitted any indication of the subsequent equipment failure, stressing instead *only* that GIMC "mishandled" and "negligently" "performed" Ms. Benally's "surgery," causing "permanent damage." *Id.* at 272. That omission further underscores the fact that Ms. Benally's notices reflected a laser-like focus on how GIMC performed her surgery. Against this backdrop, we discern no basis to conclude that Ms. Benally's notices—explicitly or implicitly—presented to the government any concerns related to her post-operative care. And, given the absence of these allegations, the government reasonably could have concluded that Ms. Benally did not intend to assert a claim of negligent post-operative care and that, consequently, no investigation into post-operative matters was necessary.

Ms. Benally resists this result, asserting that her position is supported by our decision in *Trentadue*. Ms. Benally, however, misreads *Trentadue,* and then overstates the force of *Trentadue*'s application here. We first introduce *Trentadue*, and then explain our reasoning.

In *Trentadue*, Mr. Trentadue's "estate filed an administrative claim with the DOJ," after his death in the Federal Transfer Center in Oklahoma City, Oklahoma. *Trentadue*, 397 F.3d at 851. "The claim generally was based on the belief that

14

prison guards had murdered [Mr.] Trentadue, and included a claim for damages for intentional infliction of emotional distress based on prison officials' attempt to conceal the manner of his death." *Id.* After the DOJ denied the administrative claim, Mr. Trentadue's estate brought, *inter alia*, "a claim against the government under the FTCA for intentional infliction of emotional distress." *Id.* The matter proceeded to trial, and the district court ultimately "entered judgment against the government for intentional infliction of emotional distress, and awarded plaintiffs $1.1 million in damages." *Id.*

The government appealed, arguing that "the [administrative] claim was insufficient [for notice purposes] in that it was based on a theory that prison officials had murdered Trentadue and did not discuss the specific grounds relied on by the district court in awarding damages, namely, the government's treatment of the Trentadue family in the aftermath of his death and its actions in conducting an autopsy after claiming that no autopsy would be performed without prior approval." *Id.* at 852. We disagreed.

Addressing the government's notice analysis, we emphasized "that the FTCA's notice requirement should not be interpreted inflexibly," and interpreted that "provision to require notice of the facts and circumstances underlying a claim rather than the exact grounds upon which [the] plaintiff seeks to hold the government liable." *Id.* at 853. We then stated that the "administrative claim in th[at] case included an intentional infliction of emotional distress claim[,]

15

specified the damages sought," *id.* at 852, *and* "was based on the same underlying conduct that supported the[] amended [i.e., operative] complaint," *id.* at 853. Given those circumstances, we concluded that the administrative claim in *Trentadue* was sufficient to provide the government with adequate, statutory notice. *See id.*

Notably, the administrative claim in *Trentadue* was based on both antemortem and postmortem facts. And, significantly, some of the latter facts related to the emotional-distress claim—that is, they related to "a claim for damages for intentional infliction of emotional distress based on prison officials' attempt to conceal the manner of [Mr. Trentadue's] death." *Id.* at 851. Thus, the court in *Trentadue* essentially held that, though the operative complaint did not replicate the same theory of emotional distress found in the administrative claim, that claim provided the government with adequate notice that it should investigate postmortem agency conduct that arguably could give rise to emotional distress. More specifically, the court tacitly reasoned that the administrative claim gave the government adequate notice that it should investigate a universe of causes of the alleged postmortem emotional distress that included matters that the operative complaint generally referenced and the district court relied on. *See id.* at 853. In this case, by contrast, Ms. Benally never identified post-operative agency conduct as the basis for her claimed injury. Rather, she only referenced a post-operative matter—i.e., equipment failure—that was a *consequence* of her initial operation.

16

Thus, a government investigator would have had no basis to inquire into the quality of her post-operative care.

Indeed, Ms. Benally's notices raised only surgical concerns, and her challenges to her post-operative care came to light only in her subsequent civil complaint. Thus, *Trentadue* offers little succor to Ms. Benally, because, unlike that case, her administrative notices simply failed to provide the facts and circumstances underpinning her subsequent federal-court claim.[11]

For all of the foregoing reasons, we reject the notion that Ms. Benally's

---

[11] Notably, in *Trentadue*, we contrasted the administrative claim filed by Mr. Trentadue's estate with the claim deemed insufficient by our sibling circuit in *Dynamic Image Technologies, Inc. v. United States*, 221 F.3d 34 (1st Cir. 2000). In *Dynamic Image*, the "plaintiff filed an administrative claim for damages with the United States Postal Service following his forcible removal from a postal service trade show." *Trentadue*, 397 F.3d at 853. The plaintiff's administrative claim alleged "negligent misrepresentation, libel, slander, intentional interference with contractual relations, and discrimination under 42 U.S.C. § 1983," *id.* (quoting *Dynamic Image*, 221 F.3d at 36), while his later civil suit "brought claims under the FTCA for false arrest, intentional infliction of emotional distress and negligent supervision," *id.* "Because those causes of action were based on an incident not mentioned in plaintiff's administrative claim, the First Circuit held that the agency was not put on notice that it should investigate the potentially tortious conduct, and dismissed the complaint for lack of subject matter jurisdiction." *Id.* In contrast, we explained, "the plaintiffs' administrative claim [in *Trentadue*] specifically included a claim for intentional infliction of emotional distress and was based on the same underlying conduct that supported their amended complaint." *Id.* We conclude that Ms. Benally's case closely resembles *Dynamic Image*, because as there, Ms. Benally's subsequent civil complaint asserted a claim (negligent post-operative care) nowhere mentioned in her administrative notices (which focused only on the way in which GIMC performed the surgery). Accordingly, as with the plaintiff in *Dynamic Image*, Ms. Benally's case is distinguishable from *Trentadue*; that case does not avail her.

17

administrative notices were sufficient to satisfy the FTCA's presentation requirement with respect to her civil claim of negligent post-operative care. Therefore, we conclude that Ms. Benally's first argument related to such care is without merit.

**2**

Turning then to Ms. Benally's alternative argument, she claims that "[t]he standard of reasonable care in the medical profession treats the surgery and the post-operative care period as a unified whole necessary to a successful surgery." Aplt.'s Opening Br. at 22. Ms. Benally thus theorizes that a "medical negligence claim" inherently consists of "negligence during surgery *and* negligence during the post-operative period." Aplt.'s Reply Br. at 5 (emphasis added). Ms. Benally, however, cites no authority to support her view under the substantive law of New Mexico, which is controlling here. *See, e.g.*, *In re Franklin Savings Corp.*, 385 F.3d 1279, 1288 (10th Cir. 2004) (explaining that "state law determines whether there is substantive liability under the FTCA"). And the few authorities from other jurisdictions upon which she relies are unpersuasive.[12] Accordingly, because

---

[12]    Specifically, Ms. Benally relies on three non-binding and easily distinguishable federal district court decisions. *See* Aplt.'s Opening Br. at 16–17. She first focuses on *Hartmann v. United States*, No. 10-4012, 2011 WL 1542102 (W.D. Mo. Apr. 22, 2011) (unpublished). There, the court referenced the dictionary definition of "surgery," and found that the administrative claim provided adequate notice to support civil claims of negligent surgical performance *and* post-operative care. *See id.* at *11. The *Hartmann* court's determination, however, relied on the plaintiff's identification of his post-operative providers on

(continued...)

18

it lacks legal substance, we reject Ms. Benally's second argument.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

In sum, given the clear laser-like focus of Ms. Benally's administrative notices on the allegedly negligent performance of her surgery, we conclude that Ms. Benally's notices lacked the facts and circumstances sufficient to raise the possibility of a claim for negligent post-operative care. Accordingly, we affirm the district court's dismissal of her claim for negligent post-operative care.

**B**

---

(...continued)
the face of his FTCA claim and his reference to specific post-operative treatment. *See id.* We find no such references here in Ms. Benally's administrative notices. In particular, Ms. Benally's notices are silent regarding the role of Dr. Poe in providing care to her. Next, Ms. Benally seeks support from *Mejia v. United States*, No. 13-1789, 2016 WL 4579084 (S.D.N.Y. Aug. 31, 2016) (unpublished). There, a district court stated that "a general medical malpractice allegation includes the hospital's and/or treating physician's whole response to the medical issue, including care prior to and after the specific treatment alleged," *id.* at \*5, and found adequate notice for claims concerning the plaintiffs' "entire course of treatment," *id.* As in *Hartmann*, however, the *Mejia* court predicated its ultimate finding (at least in part) on the plaintiffs' specific reference in her administrative claim to "continuing care" *after* the initial operation. *Id.* Ms. Benally included no similar mention of her post-operative care in her initial and amended administrative notices. Finally, Ms. Benally casts her gaze toward *Coffey v. United States*, 906 F. Supp. 2d 1114 (D.N.M. 2012), to buttress her theory that courts "routinely treat claims for negligent aftercare as part of a negligent surgery claim." Aplt.'s Opening Br. at 16. But *Coffey* did not involve a surgical or post-operative care claim, and as in *Hartmann* and *Mejia*, the *Coffey* court premised its finding (at least in part) on the plaintiff's inclusion of specific facts related to each of the subsequent civil claims. *See Coffey*, 906 F. Supp. 2d at 1154–56. There is no such inclusion of specific, relevant facts in Ms. Benally's administrative notices. In sum, Ms. Benally's notices—which contain no reference to any post-operative care or provider—hardly resemble those deemed sufficient in *Hartmann*, *Mejia*, and *Coffey*. Thus, Ms. Benally's reliance on these cases is unavailing.

19

Finally, we turn to the issue of informed consent. Ms. Benally submits that "New Mexico [law] treats a claim [for] lack of informed consent in connection with medical care as part of a medical negligence claim." Aplt.'s Opening Br. at 25–26; *accord* Aplt.'s Reply Br. at 8 ("[U]nder the New Mexico state law defining the parameters of a medical negligence claim, which is the applicable law in this case, lack of informed consent is considered part of a negligent surgery claim."). From that premise, Ms. Benally argues that the district court erred in its dismissal, because her notices "'allude[d]' to lack of informed consent" by "describing an alleged negligent surgery below the standard of care and failed hip hardware." Aplt.'s Reply Br. at 9–10. The government retorts that Ms. "Benally's administrative claims failed to articulate any claim based upon lack of informed consent," Aplee.'s Response Br. at 19, and notes that, in *Staggs*, we squarely addressed—and rejected—the notion "that an administrative claim for medical negligence necessarily includes lack of informed consent when the underlying state law treats lack of informed consent as negligence." 425 F.3d at 885. The government's response is thus sound. We conclude that Ms. Benally's administrative notices failed to adequately present her informed-consent claim to the government (i.e., HHS).

As a preliminary matter, we observe that the plain text of Ms. Benally's notices contained no indication that her claim of surgical negligence involved a lack of informed consent. Nothing in Ms. Benally's notices suggested, for

20

example, that GIMC left her unaware or misinformed on the direction, scope, or potential consequences of her operation, or that GIMC proceeded to surgery without informing Ms. Benally of alternate options. Indeed, Ms. Benally described her injury—i.e., stemming from her negligently performed surgery—without mentioning "consent," her pre-operative consultations at GIMC, or any alleged deficiency in the nature or quality of the consent that Dr. Poe obtained. No aspect of her notices could reasonably have prompted the government to investigate a negligence claim based upon lack of informed consent. *See Lopez*, 823 F.3d at 976–77 (noting that a tort claim notice must "describ[e] the injury in sufficient detail to allow the agency to begin an investigation into the possibility of potentially tortious conduct," and concluding that the plaintiff's "administrative claim did not reasonably encompass his negligent credentialing and privileging claim").

Now, cutting to the heart of the issue, we conclude that Ms. Benally cannot escape the inexorable force of our *Staggs* decision, which fatally undermines her contention that references in her administrative notices to negligently performed surgery and medical-equipment failure sufficiently presented (or even alluded to) a claim for lack of informed consent. In *Staggs*, the plaintiff filed an administrative claim accusing an HHS medical facility of a "substantial departure from the standard of care" and the "negligent management of [the plaintiff's wife's] pregnancy [and] labor." 425 F.3d at 884. The plaintiff "assert[ed] that failure to

21

obtain informed consent was inherent in this language and other language indicating that during [the wife's] care, a decision had to be made about changing the course of treatment." *Id.* We disagreed. In doing so, we first noted that "[n]othing in [the] administrative claim suggest[ed] that [the plaintiff's wife] consented to a course of treatment or remained on such a course without being informed of her options and the risks," *id.*, or that she received misinformation concerning the nature of her treatment, *see id.* at 885. In light of this, we concluded "that [the plaintiff's] administrative claim lack[ed] facts and circumstances sufficient to raise the possibility of lack of informed consent." *Id.*

We then explicitly rejected "the Fifth Circuit's view that an administrative claim for medical negligence necessarily includes lack of informed consent when the underlying state law treats lack of informed consent as negligence." *Id.* Rather, we reiterated that the sufficiency of a tort claim notice must be "examined" on a "case-by-case" basis, according to the facts-and-circumstances analysis that we espoused in *Trentadue* and its progeny. *Id.*

At bottom, then, we directly confronted and rejected in *Staggs* a position virtually identical to the one that Ms. Benally advances here—namely, that a state's purported treatment under its law of a claim for lack of informed consent as part and parcel of a medical-negligence claim obviates the need for a plaintiff to adequately present in the text of its medical-negligence administrative claim facts and circumstances regarding a lack of informed consent. Consequently, as in

22

*Staggs*, we reject Ms. Benally's position.  To be sure, Ms. Benally attempts to

distinguish *Staggs*, but her arguments are unpersuasive.  Ms. Benally argues that

"*Staggs* does not control" because "*Staggs* involved Oklahoma law, not New

Mexico law."  Aplt.'s Reply Br. at 9.  However, the unique contours of Oklahoma

law had no bearing on our *Staggs* holding.  Rather, we generally rejected the idea

"that an administrative claim for medical negligence necessarily includes lack of

informed consent when *the underlying state law* treats lack of informed consent as

negligence."  425 F.3d at 885 (emphasis added).  Therefore, *Staggs*'s  holding

governs regardless of the source of the underlying state substantive law.[13]

_____

[13]        To bolster her informed-consent argument, Ms. Benally also relies on the
Ninth Circuit's decision in *Goodman v. United States*, 298 F.3d 1048 (9th Cir. 2002),
which she tells us "explains the circumstances when an informed consent claim is part of
a medical negligence claim, as was true here."  Aplt.'s Opening Br. at 29.  In *Goodman*,
the Ninth Circuit found that an administrative notice's allegations that "'things . . .
were overlooked in [a] procedure' and [that claimant's] wife 'should not have
died,'" fairly "impl[ied] that the claimant's wife agreed to a procedure involving a
greater standard of care than what she received," *id.* at 1056–57—*viz.*, fairly
implied an informed-consent claim.  In finding these allegations sufficient for
presentation purposes, the Ninth Circuit noted that it had "strong reason to think
the government well understood the general scope of [the plaintiff's] claim"
because HHS's denial of the administrative claim "expressly addressed the issue of
informed consent." *Id.*  Based partially on the indicium of notice in the HHS's
denial, the Ninth Circuit "conclude[d] that the government was fairly on notice
that the informed consent claim was before it." *Id.* at 1057.  In concluding that
*Goodman* does not aid Ms. Benally, we begin with the obvious: coming out of the
Ninth Circuit, it is not controlling precedent.  Furthermore, at the very least, the
reasoning of *Goodman* appears to be in tension with our precedent because, as in
*Staggs*, the plain terms of the administrative claim there appeared to have "no
allegations . . . that [the plaintiff] was unaware or misinformed as to the direction,
scope or potential consequences" of her treatment, 425 F.3d at 884–85, and

(continued...)

Thus, under *Staggs*, Ms. Benally's legal contentions regarding the nature of medical-negligence claims under New Mexico law cannot save her informed-consent claim. That claim is doomed because, as noted, Ms. Benally's administrative notices failed to raise the possibility that she would pursue such a claim. We thus uphold the district court's dismissal of Ms. Benally's informed-consent claim.

**IV**

---

[13](...continued)
seemingly did not "describ[e] the injury in sufficient detail to allow the agency to begin an investigation into the possibility of potentially tortious conduct," *Lopez*, 823 F.3d at 976. Lastly, even if we found the reasoning of *Goodman* persuasive, our record would not permit us to meaningfully apply it here. That is because HHS's February 11 denial is not part of the record on appeal; accordingly, unlike *Goodman*, we cannot discern whether HHS divined an informed-consent contention among the facts and circumstances of Ms. Benally's administrative notices. Any adverse consequence of this record deficiency must fall squarely on the shoulders of Ms. Benally. *See Travelers Indem. Co. v. Accurate Autobody, Inc.*, 340 F.3d 1118, 1120 (10th Cir. 2003) ("We are unwilling to reverse the decision of the district court based on a guess . . . . The party appealing a district court ruling has the burden to relieve us of such guesswork by providing the necessary documents."); *Rios v. Bigler*, 67 F.3d 1543, 1553 (10th Cir. 1995) ("It is not this court's burden to hunt down the pertinent materials. Rather, it is Plaintiff's responsibility as the appellant to provide us with a proper record on appeal."); *see also Burnett v. S.W. Bell Tel., L.P.*, 555 F.3d 906, 908 (10th Cir. 2009) (collecting cases). In any event, tellingly, neither in her *Goodman*-based argument nor elsewhere does Ms. Benally contend that the HHS's denial letter evinced an understanding that she was alleging lack of informed consent in her initial or amended administrative notices. Accordingly, for the foregoing reasons, *Goodman* offers Ms. Benally no aid.

24

Based on the foregoing, we **AFFIRM** the district court's judgment dismissing Ms. Benally's complaint for lack of subject-matter jurisdiction.


ENTERED FOR THE COURT


Jerome A. Holmes
Circuit Judge